**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

OHIO VALLEY ENVIRONMENTAL
COALITION; COAL RIVER MOUNTAIN
WATCH; NATURAL RESOURCES
DEFENSE COUNCIL,
                    *Plaintiffs-Appellees,*

v.

WILLIAM BULEN, District Engineer,
U.S. Army Corps of Engineers,
Huntington District; ROBERT B.
FLOWERS, Lieutenant General, Chief
of Engineers and Commander of the
U.S. Army Corps of Engineers,
                    *Defendants-Appellants,*           No. 04-2129

and

WEST VIRGINIA COAL ASSOCIATION;
KENTUCKY COAL ASSOCIATION; OHIO
COAL ASSOCIATION; COAL
OPERATIONS AND ASSOCIATES,
INCORPORATED; NATIONAL MINING
ASSOCIATION; GREEN VALLEY COAL
COMPANY,
                    *Intervenors-Defendants,*

CONSOL OF KENTUCKY, INCORPORATED,
                    *Party in Interest.*

OHIO VALLEY ENVIRONMENTAL
COALITION; COAL RIVER MOUNTAIN
WATCH; NATURAL RESOURCES
DEFENSE COUNCIL,
                    *Plaintiffs-Appellees,*

                    v.

WEST VIRGINIA COAL ASSOCIATION;
KENTUCKY COAL ASSOCIATION; OHIO
COAL ASSOCIATION; COAL
OPERATIONS AND ASSOCIATES,
INCORPORATED; NATIONAL MINING
ASSOCIATION,
                    *Intervenors-Defendants-*
                    *Appellants,*                    No. 04-2137

                    and

WILLIAM BULEN, District Engineer,
U.S. Army Corps of Engineers,
Huntington District; ROBERT B.
FLOWERS, Lieutenant General, Chief
of Engineers and Commander of the
U.S. Army Corps of Engineers,
                    *Defendants,*

GREEN VALLEY COAL COMPANY,
                    *Intervenor-Defendant,*

CONSOL OF KENTUCKY, INCORPORATED,
                    *Party in Interest.*

OHIO VALLEY ENVIRONMENTAL
COALITION; COAL RIVER MOUNTAIN
WATCH; NATURAL RESOURCES
DEFENSE COUNCIL,
               *Plaintiffs-Appellees,*

                   v.

GREEN VALLEY COAL COMPANY,
               *Intervenor-Defendant-*
                        *Appellant,*

                  and

WILLIAM BULEN, District Engineer,
U.S. Army Corps of Engineers,
Huntington District; ROBERT B.
FLOWERS, Lieutenant General, Chief
of Engineers and Commander of the
U.S. Army Corps of Engineers,
                    *Defendants,*

CONSOL OF KENTUCKY, INCORPORATED,
               *Party in Interest,*

WEST VIRGINIA COAL ASSOCIATION;
KENTUCKY COAL ASSOCIATION; OHIO
COAL ASSOCIATION; COAL
OPERATIONS AND ASSOCIATES,
INCORPORATED; NATIONAL MINING
ASSOCIATION,
               *Intervenors-Defendants.*

No. 04-2402

Appeals from the United States District Court
for the Southern District of West Virginia, at Huntington.
Joseph Robert Goodwin, District Judge.
(CA-03-2281-3)

Argued: September 19, 2005

Decided: November 23, 2005

Before NIEMEYER and LUTTIG, Circuit Judges, and Robert J. CONRAD, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge Luttig wrote the opinion, in which Judge Niemeyer and Judge Conrad joined.

---

## COUNSEL

**ARGUED:** Elizabeth Ann Kessler, UNITED STATES DEPART-MENT OF JUSTICE, Environment & Natural Resources Division, Washington, D.C.; Michael Randolph Shebelskie, HUNTON & WIL-LIAMS, Richmond, Virginia, for Appellants. James Millard Hecker, TRIAL LAWYERS FOR PUBLIC JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Earl H. Stockdale, Chief Counsel, Lance D. Wood, Russell W. Petit, U.S. ARMY CORPS OF ENGINEERS, Washington, D.C.; Ann R. Klee, General Counsel, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Washington, D.C.; Sue Ellen Wooldridge, Solicitor, UNITED STATES DEPARTMENT OF THE INTERIOR, Washington, D.C.; Thomas L. Sansonetti, Assistant Attorney General, Jeffrey Bossert Clark, Deputy Assistant Attorney General, Mary B. Neumayr, Timothy Racicot, John A. Bryson, Steve Rusak, John T. Stahr, UNITED STATES DEPARTMENT OF JUSTICE, Environment & Natural Resources Division, Washington, D.C., for Appellants William Bulen, District Engineer, U.S. Army Corps of Engineers, Huntington District, and Robert B. Flowers, Lieutenant General, Chief of Engineers and Commander of the U.S. Army Corps of Engineers. Robert G. McLusky, Blair M. Gardner, Lindsey K. Griffith, JACKSON KELLY, P.L.L.C., Charleston, West Virginia; William H. Wright, Jr., HUNTON & WILLIAMS, L.L.P., Richmond, Virginia; Harold P. Quinn, Jr., NATIONAL MINING ASSOCIATION, Washington, D.C., for Appellants West Virginia Coal Association, Kentucky Coal Association, Ohio Coal Association, Coal Operations and Associates, Incorporated, National Mining Association, Green Valley Coal Company. Joseph M. Lovett,

APPALACHIAN CENTER FOR THE ECONOMY AND THE ENVIRONMENT, Lewisburg, West Virginia, for Appellees.

---

## OPINION

LUTTIG, Circuit Judge:

This case presents the question whether the United States Army Corps of Engineers ("the Corps") exceeded its authority under the Clean Water Act ("CWA") when it promulgated Nationwide Permit 21 ("NWP 21"), a general permit for the discharge of dredged or fill material into the waters of the United States that allows projects to proceed only after receiving individualized authorization from the Corps. We conclude that the Corps complied with the CWA when it promulgated NWP 21. The contrary judgment of the district court is therefore vacated.

### I.

The Clean Water Act prohibits the discharge of any "pollutant" into the waters of the United States without a permit. *See* 33 U.S.C. § 1311(a). The Army Corps of Engineers has authority under the CWA to issue two types of permits for the discharge of dredged or fill material: individual permits and general permits. The Corps issues individual permits under section 404(a) on a case-by-case basis for discharges at "specified disposal sites," after providing notice and opportunity for public hearing. *Id.* § 1344(a). The Corps issues general permits, which authorize "categories of activities" rather than individual projects, under section 404(e). That section provides, in relevant part, that:

> the [Corps] may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nation-wide basis for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumula-

tive adverse effect on the environment. Any general permit issued under this subsection shall . . . set forth the requirements and standards which shall apply to any activity authorized by such general permit.

*Id.* § 1344(e)(1).

Pursuant to section 404(e), the Corps has promulgated a number of general permits, all but one of which authorize projects that comply with the permits' terms to proceed without prior approval by the Corps. The exception, NWP 21 — which authorizes discharges of dredged or fill material associated with surface coal mining and reclamation projects — requires that projects be individually authorized by the Corps. NWP 21 authorizes:

[d]ischarges of dredged or fill material into waters of the US associated with surface coal mining and reclamation operations provided the coal mining activities are authorized by the DOI, Office of Surface Mining (OSM), or by states with approved programs under Title V of the Surface Mining Control and Reclamation Act of 1977 and provided the permittee notifies the District Engineer in accordance with the "Notification" General Condition. In addition, to be authorized by this NWP, the District Engineer must determine that the activity complies with the terms and conditions of the NWP and that the adverse environmental effects are minimal both individually and cumulatively and must notify the project sponsor of this determination in writing.

Issuance of Nationwide Permits, 67 Fed. Reg. 2020, 2081 (Jan. 15, 2002).

In this litigation, plaintiffs, a coalition of environmental groups, have raised various challenges to NWP 21. The district court did not reach most of those challenges, holding simply that NWP 21 is facially invalid under *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because it conflicts with the unambiguous meaning of section 404(e). J.A. 1070. The district court accordingly suspended existing authorizations under NWP 21 and enjoined the Corps from issuing further NWP 21 authorizations

in the Southern District of West Virginia. *Id*. at 1079. This appeal followed.

## II.

The district court concluded that NWP 21 conflicts with the unambiguous meaning of section 404(e) for essentially four reasons. First, it concluded that NWP 21 "defines a procedure instead of permitting a category of activities." J.A. 1070. Second, it concluded that section 404(e) "unambiguously requires determination of minimal impact before, not after, the issuance of a nationwide permit," and that, in violation of this requirement, "NWP 21 provides for a *post hoc*, case-by-case evaluation of environmental impact." *Id*. Third, it concluded that section 404(e) unambiguously requires that general permits authorize discharges to proceed without further involvement from the Corps, and NWP 21 violates this requirement because it authorizes projects to proceed only after receiving individualized approval from the Corps. *Id*. Finally, it concluded that NWP 21 violates the statutory requirement that the Corps provide notice and opportunity for public hearing before issuing a permit. *Id*. None of these conclusions withstands scrutiny.

At the outset, we note that, while our review of the district court's construction of section 404 is *de novo*, our review of the Corps' construction of section 404 is governed by the Supreme Court's decision in *Chevron*. Under *Chevron*, if the requirements of section 404 are unambiguous, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. However, if section 404 is ambiguous or silent with respect to the questions at issue, we "must defer, under *Chevron*, to [the Corps' interpretation of its governing statute], so long as that interpretation is permissible in light of the statutory text and reasonable." *Asika* v. *Ashcroft*, 362 F.3d 264, 267 (4th Cir. 2004) (per curiam).

## A.

The district court first concluded that NWP 21 fails to comply with section 404(e) because it "defines a procedure instead of permitting a category of activities." J.A. 1070. We disagree. NWP 21 plainly

authorizes a "category of activities." The category of activities authorized by NWP 21 consists of those discharges of dredged or fill material that (1) are associated with surface coal mining and reclamation operations, so long as those operations are authorized by the Department of Interior or by states with approved programs under the Surface Mining Control and Reclamation Act of 1977, (2) are preceded by notice to the Corps, and (3) are approved by the Corps after the Corps concludes that the activity complies with the terms of NWP 21 and that its adverse environmental effects are minimal both individually and cumulatively. *See* 67 Fed. Reg. at 2081.

The district court erroneously reasoned that NWP 21 does not authorize a "category of activities" because it is defined by procedural requirements "rather than objective requirements or standards." J.A. 1072 ("NWP 21 imposes no limit on the number of linear feet of a stream, for example, that might be impacted by a valley fill or surface impoundment. It does not limit the total acreage of a watershed that might be impacted."). As an initial matter, we note that, by virtue of its incorporation of the requirements of the Surface Mining Control and Reclamation Act ("SMCRA"), NWP 21 does contain substantive requirements.[1] More importantly, nothing in section 404(e) or in logic prohibits, much less unambiguously prohibits, the use of procedural, in addition to substantive, parameters to define a "category." The district court therefore erred when it concluded that NWP 21 does not define a "category of activities."[2]

---

[1]SMCRA imposes a host of "performance standards" on "all surface coal mining and reclamation operations." 30 U.S.C. § 1265(b). For example, under SMCRA, all surface coal mining operations must "minimize the disturbances to the prevailing hydrologic balance at the minesite and in associated offsite areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations and during reclamation." *Id.* § 1265(b)(10).

[2]For the same reasons, the district court erred when it held that NWP 21 violates section 404(e) because it does not set forth the "requirements and standards" that apply to the activities it authorizes. J.A. 1072. NWP 21 plainly sets forth both substantive and procedural requirements and standards that apply to the activities it authorizes. And nothing in the statute or in the plain meaning of the words dictates that "requirements" and "standards" must be substantive rather than procedural.

## B.

The district court next concluded that NWP 21 violates the unambiguous terms of section 404(e) because it allows the Corps to defer the statutorily-required minimal-environmental-impact determinations until after issuance of the nationwide permit. J.A. 1070 ("The statute unambiguously requires determination of minimal impact before, not after, the issuance of a nationwide permit.").[3] Section 404(e) allows the Corps to issue a general permit only "if [it] determines . . . that the activities in [the subject] category . . . will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e). The district court concluded that the Corps did not make the required minimal-impact determinations before issuing NWP 21, but instead opted to make those determinations on a case-by-case basis after issuance of the permit. J.A. 1072-73.

It is clear from the record before us that the Corps did make the required minimal-impact determinations *before* it issued NWP 21. *See id.* at 512 (stating that the Corps "determined that NWP 21 . . . will authorize only those activities with minimal adverse effects on the aquatic environment, individually or cumulatively"). The Decision Document for NWP 21 and the supplement to that document, set forth at pages 469-512 of the Joint Appendix, contain the Corps' pre-issuance analysis of the anticipated environmental impact of the activities authorized by NWP 21. *Id.* at 462 ("This document contains a general assessment of the foreseeable effects of the individual activities authorized by this NWP, the anticipated cumulative effects of

---

[3]The Corps argues that section 404(e) does not unambiguously require that the minimal-impact determinations be made before issuance of a nationwide permit. The Corps believes that the statute allows it to issue a nationwide permit so long as it makes the minimal-impact determinations before the permit is actually used to authorize discharges, even if after issuance of the permit. At the very least, the Corps argues, section 404(e)'s minimal impact determination requirement is temporally ambiguous, and the Corps' reading is a permissible construction entitled to *Chevron* deference. Because we conclude that the Corps made the required minimal-impact determinations before issuing NWP 21, we do not reach these contentions.

those activities, and the potential future losses of waters of the United States that are estimated to occur until the expiration date of the NWP."). The Corps' impact analysis took account of a variety of factors, including public commentators' opinions, *id.* at 464-65 (stating that the Corps "uses substantive public comments on proposed NWPs to assess the expected impacts" and considering several suggestions made by public commentators); NWP 21's incorporation of SMCRA's requirements, *id.* at 470 (stating that the review required under SMCRA will ensure that the permit will not authorize activities that affect historic properties), 476 (stating that the review required under SMCRA will ensure that the permit will not authorize activities that will jeopardize any endangered species); the nature of the coal-mining activities authorized by NWP 21, *id.* at 475 ("The activities authorized by this NWP are unlikely to adversely affect salinity gradients, since the NWP authorizes surface coal mining activities that are typically located in inland areas."), 482 ("The nature and scope of the work authorized by the NWP will most likely restrict the extent of the beneficial and detrimental effects to the area immediately surrounding the surface coal mining and reclamation activity."); the applicability of a variety of General Conditions to NWP 21, *id.* at 483 ("No toxic discharges will be authorized by this NWP. General Condition 18 specifically states that the material must be free from toxic pollutants in toxic amounts."), 484 ("General Condition 19 requires permittees to avoid and minimize discharges of dredged or fill material into waters of the United States to the maximum extent practicable on the project site."); and data about usage of previous versions of NWP 21, *id.* at 481 (estimating, based on usage of previous versions of NWP 21, that, over the five-year duration of this issuance of NWP 21, "approximately 1,625 activities could be authorized . . . resulting in impacts to approximately 875 acres of waters of the United States"), 511 ("From February 11, 1997 to February 11, 2002, approximately 539 individual activities were authorized under approximately 156 NWP verifications, impacting approximately 42.58 acres of riverine and palustrine waters within West Virginia. Based on the types of activities authorized within West Virginia during previous years, the Districts anticipate similar use of this NWP in the future. NWP 21 generally does not cause the loss of wetlands in the state of West Virginia."). Based on these considerations and others, the Corps concluded that the activities authorized by NWP 21 "will not result in significant degradation of the aquatic environment." *Id.* at 485. This

determination was sufficient to meet the requirements of section 404(e).

The district court held that the Corps did not satisfy section 404(e) because it did not provide an *ex ante* guarantee that the activities authorized by NWP 21 would have only a minimal impact. The district court reasoned that, under section 404(e), "[t]he issuance of a nationwide permit . . . functions as a guarantee *ab initio* that every instance of the permitted activity will meet the minimal impact standard," and that, by permitting the Corps to engage in "*post hoc*, case-by-case evaluation of environmental impact," NWP 21 "runs afoul of the statutory requirement of initial certainty." *Id.* at 1070.

The district court erred. It is simply not the case that issuance of a general permit functions as a guarantee *ab initio* that every instance of the permitted activity will have only a minimal impact. Neither the phrase "guarantee *ab initio*" nor the phrase "initial certainty" appears in section 404(e). And neither that section nor any other provision of the CWA specifies how the Corps must make the minimal-impact determinations, the degree of certainty that must undergird them, or the extent to which the Corps may rely on post-issuance procedures in making them.

For two reasons, we do not believe that an interpretation of section 404(e) that would require initial certainty is tenable. First, section 404(e)(2) gives the Corps authority to revoke or modify a general permit if, after issuing the permit, it "determines that the activities authorized by such general permit have an adverse impact on the environment." 33 U.S.C. § 1344(e)(2). This provision demonstrates that Congress anticipated that the Corps would make its initial minimal-impact determinations under conditions of uncertainty and that those determinations would therefore sometimes be inaccurate, resulting in general permits that authorize activities with more-than-minimal impacts. It also demonstrates that Congress expected that the Corps would engage in post-issuance policing of the activities authorized by general permits in order to ensure that their environmental impacts are minimal.[4]

---

[4]We recognize that one possible inference to draw from section 404(e)(2) is that, if the Corps discovers that any of the activities autho-

Second, it is impossible for the Corps' *ex ante* determinations of minimal impact to be anything more than reasoned predictions. Even under the paradigmatic general permit envisioned by the district court, where the parameters of the authorized activities are delineated in objective, measurable terms, the Corps' minimal-impact determinations would necessarily be a forecast only. This is so because the environmental impact of the activities authorized by a general permit depends on factors that, as a practical matter, are outside the Corps' ability to predict with certainty *ex ante*. This uncertainty is especially acute when the Corps issues a *nationwide* permit like NWP 21 because the Corps must attempt to forecast the environmental effects the authorized activities could have if undertaken anywhere in the country under any set of circumstances. As the intervenors contend, "[i]t is impossible to conceive of a class of discharges that . . . 'invariably' could have no adverse environmental effects, individually or cumulatively. Any individual fill, depending on its location, might have more than a minimal adverse effect. It could, for instance, be located at a site that is a critical habitat for an endangered species. Moreover, any class of fills could have more than a minimal adverse effect on a cumulative basis, depending on the number and location of the fills." *Intervenors' Br.* at 52 (citation omitted).

Given section 404(e)(2)'s recognition of the possibility that activities authorized by a general permit could result in a more-than-minimal impact, as well as the impossibility of making an *ex ante* guarantee that the authorized activities could *never* result in a more-than-minimal impact, we cannot agree with the district court's conclu-

---

rized by a general permit has a more-than-minimal adverse impact, the Corps' only option is to revoke or modify the entire permit. However, section 404(e)(2) does not unambiguously require that result. In fact, that provision is most naturally read as addressing the Corps' options when it concludes that the activities authorized by a general permit have systematic adverse impacts. It does not necessarily address instances in which the Corps concludes that a particular project authorized by the terms of a general permit will have a more-than-minimal impact. As explained below, we conclude that the Corps' interpretation — that it may use more tailored means to prevent adverse impacts on a project-by-project basis — is a permissible construction of the statute and is reasonable.

sion that section 404(e) allows the Corps to issue general permits only for those activities that "will invariably have only minimal effects on the environment." J.A. 1070.

Nor can we agree with the district court's implicit conclusion that the Corps may not rely on the availability of post-issuance procedures, such as NWP 21's requirement of post-issuance individualized authorization, when it makes its pre-issuance minimal-impact determinations. *See id.* at 1072-73. The statute is silent on the question whether the Corps may make its pre-issuance minimal impact determinations by relying in part on the fact that its post-issuance procedures will ensure that the authorized projects will have only minimal impacts. We must therefore defer to the Corps' conclusion that it may do so if that conclusion is permissible in light of the statutory language and is reasonable. It is both. Again, nothing in the statute specifies how the Corps must make the minimal-impact determinations. And, given the inevitable *ex ante* uncertainty the Corps confronts when issuing a nationwide permit, its reliance on post-issuance procedures is a reasonable, if not the only possible, way for it to cement its determination that the projects it has authorized will have only minimal environmental impacts.[5]

---

[5]NWP 21 is not unique in its reliance on post-issuance procedures to ensure minimal impacts. Under General Condition 13, for example, most nationwide permits (24 of the 43) are subject to a pre-construction notification ("PCN") requirement. *See* 67 Fed. Reg. at 2090-92. Pursuant to this requirement, prospective permittees must notify the Corps of the projects they intend to undertake under the general permit and their anticipated environmental effects. *Id.* at 2090. A project cannot proceed until either the Corps notifies the prospective permittee that it may proceed or forty-five days have passed since submission of the PCN without receipt of notice from the Corps. *Id.* In reviewing a PCN, the Corps must "determine whether the activity . . . will result in more than minimal individual or cumulative adverse environmental effects." *Id.* at 2091. If so, the Corps must either require that the project undergo mitigation or modifications to "reduce the adverse effects on the aquatic environment to the minimal level," or notify the applicant that "the project does not qualify for authorization under the NWP" and require that it receive an individual permit under section 404(a). *Id.* at 2092.

This procedure is materially indistinguishable from that required by NWP 21. In both cases, the Corps engages in post-issuance review of

In concluding that section 404(e) permits the Corps to rely in part on post-issuance procedures to make its pre-issuance minimal-impact determinations, we do not suggest that section 404(e) permits the Corps *completely* to defer the minimal-impact determinations until after issuance of the permit. We would have substantial doubts about the Corps' ability to issue a nationwide permit that relied solely on post-issuance, case-by-case determinations of minimal impact, with no general pre-issuance determinations. In such a case, the Corps' "determinations" would consist of little more than its own promise to obey the law.

Apparently, the district court believed that such was the case here. *See* J.A. 1073 ("The 'category' of activities authorized by NWP 21 . . . is nothing more than the collection of activities that the Corps determines, during reviews that take place long after the issuance of NWP 21, will have minimal effects."). It is true that the Corps acknowledged in its decision document that the PCN and prior-authorization requirements would operate to ensure that NWP 21's adverse effects on the environment would be minimal. *See*, *e.g.*, *id.* at 466 (noting that NWP 21 requires "case-by-case review of all activities, to ensure that the NWP authorizes only those surface coal mining activities that have minimal adverse effects on the aquatic environment"), 478-79 (stating that, with respect to "special aquatic sites," including sanctuaries and refuges, wetlands, mud flats, vegetated shallows, coral reefs, and riffle and pool complexes, minimal impact will be ensured through individualized review pursuant to the PCN requirement), 480 ("All activities authorized by this NWP require notification to the [Corps], which will allow review of each activity to ensure that adverse effects to economically important fish and shellfish are minimal.").

---

individual projects to ensure that they have only minimal impacts. The only difference is the default rule. Under the standard PCN requirement, projects are authorized unless the Corps prohibits them. Under NWP 21, projects are prohibited unless the Corps authorizes them. This strikes us as a difference immaterial to the question we address herein. If permits that rely on the PCN requirement to ensure minimal impacts are permissible — and not even appellees contend that they are not — then so is NWP 21.

However, we are satisfied, based on our review of the Corps' decision document, that the Corps did actually make, in advance, the minimal-impact determinations required by the statute. It made those determinations after undertaking a good-faith, comprehensive, pre-issuance review of the anticipated environmental effects of the activities authorized by NWP 21, and its partial reliance on post-issuance procedures to ensure minimal impacts did not make those determinations any less valid. As explained above, section 404(e) does not unambiguously forbid the Corps from making the minimal-environmental-impact determinations by relying in part on the availability of post-issuance procedures, and such reliance is a reasonable way for the Corps to ensure that the projects it authorizes under general permits will have only minimal impacts. We therefore conclude that the Corps' minimal-impact determinations, made prior to the issuance of NWP 21, complied with section 404(e).[6]

C.

The district court's third basis for invalidating NWP 21 was its conclusion that section 404 unambiguously prohibits the Corps from creating a general permit that authorizes activities to proceed only after receiving individualized approval from the Corps. *See* J.A. 1070. The district court based its conclusion on the structure of section 404 — which contains separate provisions for individual permits (section 404(a)) and general permits (section 404(e)) — and on its belief that "Congress intended for a potential discharger whose project fits into one of [the categories of activities authorized by a general permit] to begin discharging with no further involvement from the Corps, no uncertainty, and no red tape." *Id.* at 1070, 1073-76. The district court thus held that NWP 21, which allows projects to proceed only after receiving post-issuance individualized authorization from the Corps, violates section 404.

---

[6]It is of course open to the plaintiffs on remand to reassert their argument that the Corps' minimal-impact determination was arbitrary and capricious because the Corps relied on erroneous premises or ignored relevant data (and we note that this argument concedes that there was a determination). We express no view on that matter. Our holding today is simply that the Corps did in fact make the determinations required by section 404(e).

Contrary to the district court's conclusion, nothing in section 404 prohibits the Corps from issuing a general permit that contains a requirement of post-issuance individualized consideration or authorization by the Corps. Neither section 404(e) nor any other provision of the CWA defines the term "general permit," so there is no explicit textual basis for such a conclusion. Moreover, the structure of the statute is not, as the district court believed, dispositive on this score. One cannot conclude that, simply because section 404 has separate provisions for individual and general permits, it unambiguously (or even arguably) forbids the creation of a general permit that includes a requirement of individualized consideration or approval. And even if section 404(e) was intended to create a streamlined process for authorizing insignificant discharges, NWP 21 is not inconsistent with that intent. The process for obtaining authorization under a general permit — even one requiring individualized review by the Corps — is significantly more expeditious than the process for obtaining an individual permit under section 404(a). *See* 67 Fed. Reg. at 2024 (stating that "[t]he average time to verify a NWP activity is 19 days" and that "the NWP process is faster than the standard permit process" because "[a]n individual activity authorized by an NWP does not require a public notice or the same level of review required for a standard permit activity").

Given that section 404 does not speak to this issue, the question is whether the Corps' interpretation — that general permits may contain requirements of individualized review or approval — is a reasonable one. We conclude that it is. As explained above, the Corps' post-issuance, case-by-case policing of the activities authorized by general permits is a reasonable, if not the only possible, means of ensuring that general permits are used to authorize only activities with minimal environmental effects. The Corps' construction is therefore entitled to *Chevron* deference.

## D.

The district court's final basis for invalidating NWP 21 was its conclusion that NWP 21 impermissibly allows the Corps to issue individual authorizations without providing notice and an opportunity for public hearing. *See* J.A. 1073-74. This, the district court reasoned, is inconsistent with the fact that section 404(a) requires the Corps to

provide notice and an opportunity for public hearing before issuing an individual permit, and it "eliminates public involvement in decision-making at a stage where meaningful input in the minimal impact determination is possible." *Id.* at 1074. According to the district court, Congress intended "that the Corps consider the public's concerns before making decisions about whether individual projects or categories of activities will have only minimal adverse effects on the environment." *Id.*

The fatal flaw in the district court's analysis is that the Corps *did* provide notice and opportunity for pubic hearing before making the determination that the category of activities authorized by NWP 21 would have only minimal adverse effects on the environment. *See* Proposal to Reissue and Modify Nationwide Permits, 66 Fed. Reg. 42,070, 42,076 (Aug. 9, 2001). Moreover, when the Corps made its minimal-impact determinations, it expressly addressed several of the concerns raised by public commentators. *See* J.A. 464-65. To the extent that the district court's conclusion was based on the belief that section 404 requires notice and a hearing before the Corps authorizes an individual project under a general permit, it erred. There is no statutory requirement that notice and opportunity for public hearing be provided before individual projects can proceed under a general permit, and one cannot infer such a requirement from the fact that individual permits can issue only after notice and opportunity for public hearing. Section 404(e)'s only requirement is that there be notice and opportunity for public hearing before the general permit itself issues, and that requirement was clearly satisfied here.[7]

### III.

One issue remains for our consideration in this appeal.[8] Appellants

---

[7]We also note that the public is in fact entitled to notice and an opportunity to comment on the individual activities authorized by NWP 21. This is because NWP 21 incorporates SMCRA, and SMCRA authorizes activities only after public notice and comment. *See* 30 U.S.C. § 1263.

[8]Appellees have raised numerous other challenges to the validity of NWP 21 which, although raised below, were not passed on by the district court and have not been adequately briefed by the parties. We leave those challenges to be adjudicated in the first instance by the district court on remand.

argue that the district court abused its discretion in refusing to join holders of NWP 21 authorizations as necessary parties to this case under the Federal Rules of Civil Procedure. Rule 19(a) provides that a person shall be joined if, among other things, "the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the persons's absence may as a practical matter impair or impede the persons's ability to protect that interest." Fed. R. Civ. P. 19(a). Appellants argue that holders of NWP 21 authorizations have an interest in the subject matter of this case — preventing their authorizations from being invalidated — and that their absence will impede them from protecting that interest because they will be unable to present evidence about the extent of each of their investment and reliance interests in their authorizations, evidence appellants claim is relevant to the equitable considerations the district court must take into account in crafting the scope of injunctive relief.

The district court held that joinder was not required because the parties are capable of representing the interests of the authorization holders. J.A. 1068. A litigant may serve as a proxy for an absent party if the interests of the two are identical. *See Nat'l Union Fire Ins. Co.* v. *Rite Aid of South Carolina, Inc.*, 210 F.3d 246, 250-51 (4th Cir. 2000). Here, the district court concluded that the interests of the current parties are identical to the interests of the authorization holders because the current parties include coal associations who are arguing on behalf of their members, including members with existing operations dependent on NWP 21. J.A. at 1069. In other words, the district court concluded that the interests of the current parties are identical to the interests of the authorization holders — and that the former would therefore adequately represent the interests of the latter — because both seek to protect investment and reliance interests that would be upset by invalidation of NWP 21. The district court did not abuse its discretion in so concluding and in refusing to join the authorization holders as necessary parties.

## CONCLUSION

In sum, we conclude that the Corps complied with section 404(e) when it issued NWP 21. The Corps identified a category of activities, it determined that those activities would have a minimal environmental impact both separately and cumulatively, and it provided notice

and opportunity for public hearing before issuing the permit. The Corps' issuance of NWP 21 thus fell within its authority under section 404(e). The contrary judgment of the district court and the injunction against NWP 21 authorizations are vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*